WESTERN DIST.
*October*, 1831.

COMPTON
*vs.*
MATHEWS.

**COMPTON *vs.* MATHEWS.** [*]

APPEAL FROM THE COURT OF THE SIXTH DISTRICT, THE JUDGE OF THE
FIFTH PRESIDING.

The vendee of one of several co-proprietors of a tract of land, among whom a partition has taken place, cannot in case of eviction, demand from a vendee of another of the co-proprietors a portion of the land sold to him. His remedy is by action of warranty against his vendor.

A joint heir or joint proprietor or co-parcenor can sue and maintain a petitory action against a mere possessor without title for the whole undivided succession or property.

When the existence of an instrument is admitted by the exception, or appears from the record, and its loss proved by the oath of the party, corroborated by circumstantial proof, parole testimony of its contents may be given.

A map or plat, on which the division lines of several co-proprietors of a tract of land are traced out and laid down, forms a complete partition of the joint property, as if each line had been actually run and marked by the surveyor.

Partitions may be made either really or intellectually; and an intellectual division may not only be made of rights and actions, but also of corporeal objects.

The plaintiff, L. B. Compton, instituted his petitory action in the District Court for parish of Rapides, in 1820, to recover from the defendant a part of a tract of land containing one thousand five hundred arpens, lying on Bayou Bœuf at the Biloxi Indian Village, which he alleges is in possession of and claimed by the defendant.

The defendant pleads a general denial; and alleges the parties own land adjoining each other, their titles being derived from the same source; that his is the oldest, and gives him a right to hold and possess thirty-two and a half arpens front on Bayou Bœuf with the depth of one league. That the plaintiff has already moved his fence two or more acres

---

[*] Judge Mathews being the defendant, did not sit in this cause. It was tried before judges Martin and Porter.

on to his land, for which he now claims judgment in re-convention. He prays to be put in possession of that part of his land actually occupied by the plaintiff, and to be quieted in his possession to his entire tract of thirty-two and a half arpens front, &c. He also pleads the prescription of ten and twenty years.

The land in dispute is part of a large tract, purchased in 1802, of the Choctaw, Biloxi and Pascagoula Indians, by A. Fulton and William Miller, containing forty-six thousand eight hundred arpens. Miller and Fulton conveyed one-third, or fifteen thousand six hundred arpens of this purchase, to D. Clark, and took Levi Wells in as a partner for the remaining two-thirds, which gave him two-ninths of the whole tract. The parties made a partition among themselves according to their respective portions, beginning at the mouth of Bayou Claire, a point certain, and running down Bayou Bœuf, on both sides, to include the forty-six thousand eight hundred arpens. Fulton had sixty-five arpens allotted to him at the upper end of the tract. After setting off thirty-two and a half arpens front above, he on the 11th of April, 1809, conveyed the remaining thirty-two and a half arpens below, to the defendant. Wells had sixty-five arpens set off to him immediately below Fulton. Wells, in 1808, sold to the plaintiff one thousand five hundred superficial arpens, beginning at Fulton's lower line, and running down both sides of the bayou. He now claims to run up ten or twelve arpens on defendant's land. There was judgment for the defendant in reconvention. The plaintiff appealed.

*Scott,* for plaintiff.

1. Our title having definite calls, viz. " To commence at the first turn of the Bayou below the Biloxi Village, running up the bayou twenty-five arpens," and being prior in date to to the defendant's, is entitled to a preference and ought to be first located. The defendant's title calling to adjoin Levi Wells below, under whom the plaintiff claims.

2. There never was an absolute and final partition between the original co-proprietors, Fulton, Miller and Wells, in such

form as to be a complete alienation of the several portions from one partner to another.

3. The defendant cannot call on the plaintiff to invoke a new partition: none but the original co-partners themselves could do that; and they having conveyed all their interest in the land to third persons, have *deprived themselves* of the power of exercising this right. The joint property has become as absolute, separate and divided, as if it had been made in the most formal manner.

4. The testimony of Judge Johnston, which goes to show that a partition and division had been made and signed by the co-proprietors, ought not to have been admitted, because the loss of the original is not shown, nor is its genuineness proved.

5. It is admitted that Clark was a partner originally for one-third of the entire tract, but Miller and Fulton having passed an act of sale to him for this quantity, for a certain price, to which act Wells was no party; and if it included more than Miller and Fulton had a right to sell, it must be taken from their portions.

6. The purchasers of Wells, must be maintained in their rights to that extent, and the purchasers under Miller and Fulton, restricted to the extent they were authorised to sell, if they have sold more than their quantity.

7. Prescription cannot avail the defendant, because no boundaries between the parties were ever established, nor does the proof show possession of ten years, prior to the commencement of this suit.    3 *Martin, N. S.* 11.


*Barry* and *Boyce*, on same side.

1. The vendors of the defendant, previous to their sale to him, acknowledge in an agreement with Hatch Dent, that Wells, the vendor of the plaintiff, was a partner with them in the Indian purchase: and a recital in a deed is good evidence against the grantor.    1 *Starkie*, 309, *note* 1.

2. Miller and Fulton made a verbal and authentic acknowledgment of Well's title to two-ninths of the whole Indian

purchase: they locate him between them, with Fulton above
and Miller below him.

3. The plaintiffs title is eldest ; and he has held by a *bona fide* title and conveyance, with constant possession. Fulton, the vendor, of the defendant knew of plaintiffs purchase from Wells, before he sold to Mathews, and the attorney of the latter, who made the purchase from Fulton, also knew of it. They are both the *ayant cause* of Miller and Fulton. A private act between them is of equal force as an authentic one. As defendant knew of the plaintiff's purchase, no registry was necessary. 4 *Martin, N. S.* 378. 2 *vol. American Digest,* 173. *Civil Code, page* 306, *art.* 224. 8 *Toullier,* 374. 9 *Johnson,* 163.

4. The whole Indian purchase, as confirmed by Congress, amounted to twenty thousand eight hundred and thrity-two arpens. Miller and Fulton sold to Clark by authentic act, fifteen thousand six hundred arpens, which the defendant has offered in evidence in this cause, and cannot attack. Before this sale, they acknowledged Wells's share to be two-ninths of forty-six hundred and twenty-nine arpens, *ergo,* the part remaining to Miller and Fulton, of their original purchase, was only six hundred and three arpens ; but Fulton sold five thousand two hundred as his share, which amount, the defendant claims as his vendee.

5. Wells, the vendor of the plaintiff, had an undisputed right to four thousand six hundred and twenty-nine arpens and he sold to the plaintiff only fifteen hundred arpens.

6. Even on the supposition that Clark's share was only one third, of the whole confirmed claim ; then Miller, Fulton and Wells, are entitled to forty-six hundred and twenty-nine arpens, making a front on the Bayou of fifty-seven arpens each. But Fulton sold to defendant et als. fifty-two hundred arpens making a front of sixty-five arpens. Fulton sold to the defendant more than he had a right to sell. Wells sold to plaintiff less than his right. The only question is, whether the vendor of Fulton, shall, in order to complete his illegal title, interfere with the legal and just rights of the plaintiff

7. The parole testimony in this case, as well as the defen. dant's admissions of record, prove there was no fixed boundary except Clark above, from which all their titles started, calling for each other successively.

*Bullard,* for the defendant.

1. The plaintiff holding under *Wells,* who appears to have owned an individual portion of the land purchased by Miller and Fulton from the Indians, cannot recover any particular part from the defendant, who holds directly under Miller and Fulton themselves, without showing that a partition took place, and that the *locus in quo* was specifically assigned to his vendor.

2. If no partition ever took place, the only action which Wells himself could maintain, except against a naked possessor without title, would be an action of partition; and that right of action has not been ceded to the plaintiff, who has no quality to provoke such a partition, and who has not pretended to do so in this case, and if he had, it is not against proper parties.

3. That a partition did in fact take place, and that the *locus in quo* was assigned to the vendor of the defendant, as a part of his share; and that the vendee of one co-partner, cannot be disturbed by the vendee of another, under pretence of errors in the partition.

4. The only remedy of the several co-proprietors, in case of eviction of the partition, is by action on the warranty against each other.

5. That the act of Congress, limiting the entire claim or purchase from the Indians to three leagues, does not amount to an eviction of any of the co-parcenors who had divided the land on the supposition that they were entitled to something more under the purchase; and if it did, in order to entitle the plaintiff to recover it, must be shown that Wells's share had been diminished at least one-sixth, to entitle him to have recourse on his warranty. But it does not appear but that Wells is yet in possession of his whole share.

WESTERN DIST.
October, 1831.

COMPTON
vs.
MATHEWS.

6. That the defendant, holding under one of the co-proprietors as a third person, his land is exonerated even from the legal mortgage to make good the lots of the others, after ten years from the date of his purchase. *Civil Code, page 204, art.* 247.

*Porter, J.* delivered the opinion of the court.

This case has consumed much time in the discussion, but it has not been unprofitably employed; for although the questions of law arising on the facts, are clear and free from doubt, these facts are numerous and complicated ; and required the aid of counsel to be fully understood.

The action is a petitory one, for a portion of land lying and situated in the parish of Rapides, on the Bayou Boeuf, containing $392\frac{14}{100}$ arpens having between nine and ten arpens front on the water course, and running back forty     Both parties own a larger tract adjoining, on which they have established plantations.

The marginal note: *The vendee of one of several co-proprietors of a tract of land, among whom a partition has taken place, cannot in case of eviction, demand from a vendee of another of the co-proprietors a portion of the land sold to him. His remedy is by action of warranty against his dor.*

The plaintiff claims the premises in virtue of a sale made to him by Levi Wells, deceased, on the 20th January, 1808, for fifteen hundred arpens of land, and the defendant sets up title under a purchase from Alexander Fulton, on the 11th April, 1809. This sale was made by public and authentic act. That of the plaintiff, was by *sous seing privé*, which was recorded on the 15th October, 1815. The vendors of both parties acquired their titles from the same source ; and this circumstance compels us to go into an examination of the facts connected with their original purchase, and the rights acquired under it.

While this country was under the dominion of Spain, and a short time before the United States took possession of it, Alexander Fulton and William Miller, then inhabitants of the post of Rapides, purchased from three tribes of Indians whose villiages adjoined each other, a tract of land containing forty-six thousand eight hundred arpens. After the purchase they sold to Daniel Clark, of New-Orleans, one-third, viz: fifteen thousand six hundred arpens. Whether the sale was made in consequence of Clark being a partner in the original

WESTERN DIST.
October, 1831.

COMPTON
vs.
MATHEWS.

contract, and for the purpose of showing the extent of his right in it, as his name did not appear in the conveyances from the Indians; or whether it was a sale to him as to any other third party, the record does not give positive information; nor is it material to enquire. We gather from the evidence, however, to our entire satisfaction, that Wells, the vendor of the plaintiff was taken in by Miller and Fulton as a partner in the two-thirds of the land which remained, after the sale to Clark.

Things being in this situation, Clark, owner of one-third of the tract; and Miller, Fulton and Wells, owners of the other two-thirds, we find other facts on which there is no dispute between the parties; namely, that soon after the land became the property of four proprietors, each of them commenced selling particular portions of it to other individuals. In making these sales, they do not seem to have selected indiscriminately any spot of the tract. On the contrary, their sales are all made on the idea, that a portion equal to the certain right of each belonged to the vendor, at and adjoining the particular place he sold. The calls in the titles, and the acts of the parties incontestibly prove this.

The action we have seen is a petitory one; and the plaintiff must recover on the strength of his own title. He must in this case, as in all others which are similar, show, before the possessor can be put on his defence, a legal title to the premises in dispute; and when the defendant's title is produced, the plaintiff's must prove superior; otherwise the defendant will be maintained in his possession. This is on the familiar maxim, *melior est conditio possedentis.*

The first inquiry, then, is, what title has the plaintiff produced? That title appears to be a sale from Levi Wells, one of the partners in the purchase made from the Indians; and is for fifteen hundred arpens of land on the Bayou Bœuf. It may be admitted, and the doctrine would seem to be founded in good sense, that as against a mere possessor without title, a joint heir, or a joint owner, can maintain a petitory action. Although, says *Pothier*, in strictness of law, the heir can only sue for the undivided part which belongs to him, yet equity

A joint heir or joint proprietor or co-parcenor can sue and maintain a petitory action against a mere possessor without title for the whole undivided succession or property.

prefers that, until the other heirs appear, he who demands the succession or any portion of it, should be preferred to the mere usurper who has no title whatever. We have looked from curiosity into the common law rules on this subject, and we find them quite conformable to those of our own. Coke in his Commentary on Littleton, in treating of co-parcenors, observes, "And as they be but one heir, and yet several persons; so have they one entire freehold in the land as long as it remains undivided in respect of any stranger's precipe." *Pothier traité des droit de Proprieté, part 2, chapter 2, § 4, number* 115. *Coke on Littleton, liber 3, § 241.* (163 *A.*)

Admitting, therefore, the plaintiff, as purchaser of a particular portion from one of the heirs, represented that heir in his right to the part acquired; and that the sale produced in this instance would be sufficient to recover the property from a stranger without title; and is sufficient to put the defendant on the proof of his; we have next to examine what is the force and effect of the plaintiff's title against that which the defendant sets up, under a purchase from Fulton, the co-partner of Wells, the plaintiff's vendor. The plaintiff, we have seen, must show not only a title equal, but superior to that of the defendant; and here we confess we have been wholly unprepared to hear the argument pressed upon us by the counsel for the petitioner, that there never had been a partition of the land in question between the partners in the original purchase. It was pressed on us, and presented in different points of view. If it were true, and had it produced the effect desired, on our minds, it is manifest, the plaintiff could not maintain this action, and we should be compelled to nonsuit him. It might be contested, but it is not necessary to decide, whether the purchaser of a particular and defined portion of a larger mass, which is jointly owned and undivided, has the rights of his vendor, and is co-proprietor of the entire estate, to call for a partition of the whole. But admitting to the full extent of the proposition that he has the same right of his vendor, he cannot have more. This we suppose may be assumed as a position beyond all controversy. Assuming it to be so, and supposing Wells, instead of his vendee, were

now before the court, could he claim from one of his co-part-
ners the whole of any particular portion of the land, and at
the same time lay as the basis of his demand, that as he was
a joint proprietor, and there never had been a partition, he
was therefore entitled to the particular spot claimed? The
statement of the proposition, it appears to us, carries the
answer with it. You have an undivided right to two-ninths
of the whole and two-ninths of each part, but you cannot
claim the entire right to the smallest portion, not even to one
foot of it. If this be true, how is this right to be examined,
and settled? Not, it is evident in a petitory action, for the
whole of a particular part against one heir in possession, but
in an action of partition in which the share of each (if there
be more than two) can be ascertained and set apart. To
know the share of each, all the partners must be parties to
the suit. This is every days experience and practice; and as
it is the law, so is it the reason of the thing. For as the
object of the partition, is to give the entire right in a particular
portion of a large mass, to one of several who hold that mass
in common, it is self evident that any division among a fewer
number than the whole, would leave the interests of the rest
untouched, and the property would continue undivided.
*Code of Practice, articles* 1024, 1025. *Louisiana Code, articles*
1231, 1252.

Believing, therefore, that it is indispensable for the plaintiff
to show that there has been a partition of this tract, we
proceed to examine whether he has established one which
shows him entitled to the premises in question.

But before setting out that title, it may be proper to dispose
of one of the grounds assumed by the plaintiff. It is this:

"You claim," he says to the defendant, "under Fulton,
and Fulton at the time he sold to you, had disposed of all his
right title and interest in the Indian purchase, to Clark.
That sale which purports to be by Miller and Fulton, but
which is only signed by Fulton, disposes of fifteen thousand
six hundred arpens which is more than the vendors share in
the thirty thousand eight hundred and twenty-two arpens,
which have been confirmed by Congress. It is true you

supposed at the time of the sale, you were entitled to forty-six thousand eight hundred arpens, but Clark is not responsible for any diminution that may have taken place in the extent of your original grant; and he has a right to the whole superficies expressed in the deed to him. These fifteen thousand six hundred arpens, therefore, deducted from the twenty thousand eight hundred and thirty-two confirmed, leaves only fifty-two hundred and thirty-two arpens, and to much the greater part of that surplus my vendor was entitled; as he never joined in the alienation to Clark. Miller may have a right to a part of it, but your vendor has none, nor had none from the moment he conveyed to Clark; and he sold to Clark, before you bought from him."

This ground of defence, as we understand it, is virtually setting up an outstanding title in Clark or his representatives to the premises in dispute; or if not to them, to so much of the other portions of the land as deprived Fulton at the time of the sale of any title to the portion acquired by the defendant from him. If true, it would give an entirely new complexion to the rights of the various persons who have been for a long time settled within the Indian purchase; and different from the various deeds and conveyances to and from the parties interested during the last twenty years. It is contradicted by the tenor of all the evidence in the cause, except the naked expressions in the act of sale to Clark. And the references in that sale to other documents, shows it to rest on an unsound basis. This instrument, when examined, refers to plans of survey which designate the portions the vendee acquired. Only one of these plans is produced. We see by it that eleven thousand six hundred arpens are included within lines which, beginning at the upper limit of the purchase from the Indians, and running down the bayou for quantity, do not approach the *locus in quo*. On the contrary, the very plat of survey marks as adjoining the lower limits of Clark, the upper part of that portion of the tract, which had been set apart for Fulton, the vendor of the defendant. The reason why so large a superficies on so small a front is obtained, is, that at the time of the sale, the parties supposed they had a depth of eighty arpens,

18

instead of forty, as it was ultimately confirmed. Now, if the purchaser cannot get the whole of the land to him within certain limits, it may, or it may not, according to circumstances, give rise to rights against his vendor. But it certainly confers no right to take the land in another part of the tract which was purchased by a subsequent vendee. The plat of survey of the other, and remaining eleven thousand arpens, is not produced, but it is proved by parole evidence, which it will be hereafter seen, was properly introduced ; that this portion acquired by Clark was located on the lower extremity of the tract, far out of the limits in question, and located with the double depth.

The rights of Miller and Fulton, therefore, in the tract of twenty thousand eight hundred thirty-two arpens confirmed, must be tested by the quantity which they sold within the limits, and not by that which they disposed of without them. It is obvious, that a sale of the double depth, lying beyond the boundaries owned in common, cannot affect their rights on the property, which finally by confirmation of Congress, formed the subject of the partnership ; no more than if they had sold land any where else, in Ouachita or in Baton Rouge.

This opinion proceeds on the idea, that both Miller and Fulton sold to Clark ; for although the sale is only signed by Fulton, Miller's signature is to the map, which purports to represent Clark's portion in the Indian lands, and by a sale subsequently made from Clark to Miller, Miller buys back a part of the land which "he and Fulton had sold to Clark," by an act bearing date with that signed by Fulton.

The sale from Wells to the plaintiff is for fifteen hundred arpens of land, and gives the following description; "to be laid off as follows :   The lower line to commence on each side of the Bayou Bœuf, and at the first turn in the said Bayou, below the main Biloxi village, and to run twenty-five arpens one hundred and eighty feet to the arpen, measure of Paris, up the said Bayou, parallel with the base line of the whole tract of the Indian claim, as it was run by Fred'k. Walthers."

The most definite and controlling call in this title, is at the first turn in the Bayou, below the Biloxi village. By the plat of survey returned in this cause, it appears the plaintiff has taken for his departure in running the base line, an elm tree, which is at the upper end. The expressions in the title, "at the first turn in the Bayou," would be satisfied, either by a location on the lower end, or at the upper end of the turn.

Were it material in this case to decide the point, it would perhaps be correct to say, that a middle point, between the upper and lower ends of the turn, formed the proper beginning. The plaintiff, it appears, once entertained the idea, that any spot at the turn would satisfy these calls, for it is shown that he sold his brother a tract of four hundred arpens, lying below the point at which his survey now begins. There is also proof that the plaintiff and defendant, so far back as the year 1810, with the assistance of a surveyor, fixed on a dividing line between them, a little below that now contended for by defendant. This survey, however, made without actual measurement, was discovered to be erroneous, and on a subsequent survey in 1817, when the land was actually measured, the defendant was found to be one or two arpens within plaintiff's line as it was then understood. This quantity was soon after surrendered to the plaintiff, but after receiving it, he still complained that the lines had not been correctly run.

In further support of the correctness of the limits now claimed by him, the plaintiff shows by a sale from William Miller, one of the original grantees to Hatch Dent, of twelve and a half arpens front, on the upper part of Miller's tract; by one of Wells the plaintiff's vendor, of the same quantity, to the same vendee, of twelve and a half arpens on the lower part of Wells's tract, that these parties had established a line between them for the division of their respective portions in the Indian purchase. That measuring from the line up to the point, which the plaintiff insists is his upper boundary, the quantity of $57\frac{91}{100}$ arpens is obtained : and that this quantity is precisely the one third of the land which remains to Miller, Fulton, and Wells, after the portion sold to Clark, is deducted from the quantity confirmed by Congress.

WESTERN DIST.
October, 1831.

COMPTON
vs.
MATHEWS.

· He still further proves by Miller, one of the original grantees, that there was an arrangement between all the partners about the division of the Bayou lands ; and that the portion conveyed by Wells to Compton was considered within Wells's part. That Fulton knew of the sale from Wells to Compton, and the terms, and was glad the contract had been made.

The plaintiff also refers to sales and other instruments, executed by Fulton, in which he describes his land as bounding on that of Wells below.

These facts, we believe, exhibit the whole strength of the plaintiff's case ; and the contest between the parties narrows down to the inquiry, whether the defendant shows any act emanating from all the owners of the Indian purchase, which gives him an equal, or better title to the *locus in quo.*

He has endeavored to show one by a map executed under the direction of the grantees, in which a partition had been made ; which map had the signatures of all the parties affixed on it. This map he alleges has been lost, and he offered parole evidence of its contents. His right to make this proof has been contested, on the ground that he has not given sufficient evidence of the loss of the instrument.

The first inquiry usual in cases of this kind, namely the existence of the instrument, is dispensed with by the exception being confined to the want of proof of the loss of it. We at first thought the exception had extended to the existence and the loss : and on examining the record, we found abundant proof, oral and written, that such a map had been made.

Our code requires, in order to justify the introduction of secondary evidence, that there should be the oath of the party, and such circumstances as render the loss probable. The defendant swears, that he enquired at Pedesclaux's office, and could not find the plat of survey. That he next enquired of Relf, the executor of Clark, who informed him that the papers and plans relating to Clark's claim, had been delivered to Judge Baldwin. A *subpœna duces tecum* had issued to Baldwin, and Boyce his attorney, to produce the instrument.

Wells proved that he went to the office of Pedesclaux, and inquired for the plat. He was told it had been given, to

*When the existence of an instrument is admitted by the exception, or appears from the record, and its loss proved by the oath of the party, corroborated by circumstantial proof. Parole testimony of its contents may be given.*

Clark. Witness had made frequent inquiries for it, and had offered five hundred dollars for it. Witness had corresponded with the register at Opelousas, who stated that the plat deposited there had been stolen out of the office. Witness had called on Judge Baldwin, through an order of court to produce the map; and it had not been produced. Scott, who was a vendee of a portion of the Indian lands, swears that he had made many, and unsuccessful inquiries about the paper.

The court below thought this such evidence as authorised the introduction of parole testimony; and we think it did not err. It complies with the requsitions of the code. The oath of the party negatives all idea, that the paper was in possession or within his power. The testimony shows circumstances which render the loss of the instrument probable.

The parole evidence shows the plat to have been signed by all the partners, and the first question on this branch of this subject is, were that plat now before the court, would it be written evidence of the partition?

We think it would. It has all the characteristics of that species of proof. It conveys information through the eye, by characters traced by the hand on paper, and has every advantage of written evidence as to fidelity and durability. *Pothier* and *Touiller*, class tally's of tradesmen, under the head of literal proof. The English law considers surveys as written proof; and when ancient, they make evidence in themselves, without proof of their execution. *Pothier on Obligations, number 730.* 8 *Touillier, 591, number 406. Phillips on Evidence, 322.*

*A map or plat on which the division lines of several co-proprietors of a tract of land are traced out and laid down, forms a complete partition of the joint property, as if each line had been actually run and marked by the surveyor.*

The testimony of the witness who proved the signature of the parties to the instrument was objected to as inadmissible. He was, however, correctly admitted. It is every day's practice to admit agents to testify. Any supposed interest that might arise from the witness once having owned lands in the Indian purchase adjoining the defendant's tract above, was removed by a release which the latter executed.

The facts proved by the witness may be given in his own words. We could not condense, nor make them clearer. "Miller and Fulton, after they purchased the lands on Bayou

Bœuf, caused the land to be surveyed, and a map made of it. After Clark and Wells became interested in the purchase, the parties divided the land among themselves, fixed the quantity of each, the location, and allotted the portion of each ; and designated the same upon the general map of the land, which was signed by all the parties.   The whole tract contained forty-six thousand eight hundred arpens, running back eighty arpens on each side of the bayou, and except on the upper side, where twenty-five arpens run back only forty arpens on one side.   Of this quantity Clark took fifteen thousand six hundred arpens, and Miller, Fulton and Wells, ten thousand four hundred arpens each.   To Clark was assigned eleven thousand six hundred arpens on the upper side, including the Choctaw Village, and running down near to the Pascagoula Village, and ran from Clark's lower line sixty-five arpens front on the base line.   Then came Wells, running sixty-five arpens front from Fulton's, including the site of the Biloxi Village.   Then came Miller below Wells for the same quantity ; and then came Clark's twenty-five arpens, making his complement below of four thousand arpens.   These lands being thus divided by quantities and located, their separate portions as allotted, was designated on the map of the whole tract.   And then a separate map of each of the portions was made, representing the bayou and the boundaries, and each of the parties had a map of his part.   He has seen and inspected those of Clark and Fulton ; he knows the boundary fixed in the general map between Clark and Fulton, corresponds with that of Fulton's purchase of the land.   The present boundary is very near the place as designated on both."

The testimony obtained from the witness, whose character is unimpeached, and of course we presume unimpeachable, is corroborated by the other evidence in the cause.   The plat annexed to the sale made by Miller and Fulton to Clark, which plat was deposited in Pedesclaux's office, supports it. One of the small plats made at the time the witness speaks, and given to Fulton as the evidence of his share is also produced, and was properly received as making a part of the *res gesta·*

This again corresponds with and sustains that obtained from the notary's office; they both show such a division as the witness speaks of. The surveyor who was called on the trial, and who measured the whole tract, swears that the general map of Walther was made with great accuracy. That the bayou was correctly laid down; and that the particular plat of Fulton's part corresponds with the actual location made by the defendant, his vendee.

It has been objected, that this evidence does not establish a partition, because the division was made on the map; and not on the land; that the lines there traced were intellectual, and merely existed in the mind.

We do not think this takes away from the division, the character of a partition. Actual separation of parts is not necessary to produce it. The act of the co-partners, allotting to one, and another, a portion of the mass which each can take, and each enjoy without interruption with the part assigned to his co-parcenor is sufficient. If the doctrine contended for were true, letters cut on trees, or posts set in the ground after an actual survey would not produce division of the tract. The respective portions would still remain corporeally united, and the marks on the trees, or the post placed in the ground would only indicate where the line had once run; and where it might be traced again. A line which can be ascertained by measurement, according to distances already agreed on, produces as perfect a separation in the eye of the law, as that which may be drawn, by going from one marked object to another. There is no difference. The legislation of the country, at the time the transaction took place, made none. Febrero, states in express terms, that partition may be either real or intellectual; for, says he, as things are divided intellectually by the law, they may be by man; and he adds, that the intellectual division may not only be of rights and actions, but also of corporeal objects. Febrero, page 2, liber 1, chapter 2, sect. 4, numbers 57–8.

Partitions may be made either really or intellectually: and an intellectual division may not only be made of rights and actions, but also of corporeal objects.

Let us now compare the strength of the respective titles.

The defendant shows an actual partition to have taken place. That all the partners consented to it, and agreed that

each should take a particular portion of the tract. That they proceeded to enter and enjoy their respective parts. That the vendor under whom he claims, entered into the portion allotted to him; that he sold to others, in conformity therto; and finally that the *locus in quo* now held by him; is within the limits assigned to his vendor.

These acts in our opinion vested in each of the partners, a legal title to the part set off to him by this partition.

Against this title, the plaintiff claiming under one of the partners Wells, shows, that a line was established between his vendor and another co-partner Miller, by which Wells's title did not begin at sixty-five arpens below Fulton's line, according to the partition previously made, but fifty-seven arpens and a fraction. If this act amounts to a rescission of the partition, and controls the limits of the land already assigned to Fulton, the plaintiff must succeed : otherwise he cannot.

But it is clear that no act between Miller and Wells can affect Fulton's interest, unless Fulton assented to it.

Hence an attempt was made in argument to show that assent; but in this, we are of opinion the plaintiff entirely failed. Miller, indeed, proves that the land conveyed by Wells to Compton, was considered to be within Wells's purchase, and that Fulton knew of the sale and the terms. But though it might be so considered, if in point of fact it were not so, nothing implies Fulton's consent. On the contrary, Miller swears that in his opinion, Fulton "would have made objections if he had thought his land was taken by the conveyance from Wells to Compton." The country at that time was an almost impenetrable forest and canebrake. The separate portions of each partner had not as yet been actually measured nor marked. It was, therefore, very difficult, if not almost impossible, to say, until that measurement took place, where the line of each partner would run. Nothing, therefore, can be inferred from his silence. Can it from any other circumstance in the case ; from the calls in the sale, for example, from Wells to Compton ? This call, we see, was at the first turn on the bayou below the Biloxi village. Expressions which

gave the purchaser the same right to begin at the lower part of that turn, as on the upper; and if fixed at the latter, the interference would have been little or none. Is it from the location of the plaintiff? It is shown he took possession and sold to another below the point, which he now fixes for his commencement. Does it arise from Fulton giving as a boundary in the sale to the defendant, Wells's tract? Whether the plaintiff or defendant be right in their pretensions, Wells's land would still have been the boundary below. When we join to the absence proof of assent, the fact that within one year after, Fulton sold with warranty to the defendant, the very land which it is now said he abandoned, we do not think there can exist a doubt, that no such assent was given.

But it has been urged with earnestness, that the confirmation by the act of Congress, has reduced the front of the tract and diminished the quantity, which some of the partners held, and particularly that of the vendor of the plaintiff. This is true, but it does not follow that the vendee under a partition formerly made, can be evicted; or that a question involving so many matters as would arise on a new partition, can be settled by two out of a great many of the vendees of the partners. All must be before the court, were this a case in which a re-partition could be called for. But it could not in our judgement, if all were before the court. The Spanish law required the *lesion* should amount to one-sixth, to justify a resort to such a measure; and here only eight arpents are lost, which is not the one-sixth of sixty-five arpents.

But on the other ground, no such rescission could take place. By the same law, where the error did not arise from inequality in the lots, or fraud, or error, but from eviction taking place, subsequent to the partition, no rescission was allowed. Each partner remained in possession of the objects partaken, and was responsible to his co-partner in warranty. Here no inequality existed at the time of the partition, but all the injury sustained, has proceeded from an eviction since produced by a higher title, viz: That of the United States. *Febrero, part 2, lib. 2, chap. 9, sect. 1, nos.* 1—6. *Ibid, sect.* 2 no. 20.

19

On no ground therefore, that we can find tenable, or sustained by law, can the defendant be deprived of the premises in dispute.    We have we believe, noticed all the points made in the cause; and we have endeavored to make the case as plain to others as it appears to us.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be affirmed, with costs.